## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **MICHELE E. MINOR,** *et al.*, | | |
| | * | |
| **Plaintiffs,** | | |
| | * | |
| **v.** | | **Case No.: PWG-15-983** |
| | * | |
| **PRINCE GEORGE'S COUNTY,** | | |
| **MARYLAND,** *et al.*, | * | |
| | | |
| **Defendants.** | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## MEMORANDUM OPINION AND ORDER

Prince George's County Deputy Sheriff Kendal Wade responded to a 911 call for protection with regard to Michael R. Minor, who had been drinking, had made violent threats, and had said he was going to get his gun. Am. Compl. ¶¶ 11–15, ECF No. 10. Deputy Sheriff Wade ordered Minor to keep his hands away from where the gun may have been concealed and, when Minor disregarded this order and appeared to reach for a gun, Wade shot and killed him. *Id.* Minor's mother, Michele E. Minor, personally and as the personal representative of her son's estate, and Kira R. Simmons, the mother of his son MJM, as MJM's next best friend, filed a 42 U.S.C. § 1983 action against Deputy Sheriff Wade, Prince George's County, Maryland (the "County"), and Sheriff Melvin C. High, Compl., ECF No. 1, and then voluntarily dismissed the claims against Sheriff High, ECF Nos. 47, 48. Pending is Defendants' motion for summary judgment[1] on the remaining claims. Because the undisputed facts, though tragic, show that

---

[1] The document filed as Defendants' motion is titled "Defendants Prince George's County, Maryland and Deputy Sheriff Kendal S. Wade's Memorandum of Law in Support of Motion for Summary Judgment." ECF No. 55. Defendants did not file an actual motion, as the Federal

Deputy Sheriff Wade's actions were objectively reasonable, he is entitled to qualified immunity, and summary judgment is appropriate on the Plaintiffs' § 1983 claims, state constitutional claim, and state tort claims.  Additionally, Plaintiffs concede that, even though they brought a claim for "Survival Act" (Count I), Maryland's Survival Act, Md. Code Ann., Est. & Tr. § 7-401(y) does not "provide[] a separate and distinct cause of action."  *See* Pl.'s Opp'n 25.  They also concede that their § 1983 claim against the County (Count VIII) should be dismissed.  *Id.* at 25 n.2. Accordingly, I will dismiss Counts I and VIII on that basis.

## **Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Instead, the

---

Rules of Civil Procedure and this Court's Local Rules require.  *See* Fed. R. Civ. P. 7(b)(1); Loc. R. 105.1.  In the interests of efficiency and justice, I will overlook this deficiency (which the County would be wise not to repeat) and accept ECF No. 55 as their motion for summary judgment and memorandum in support.  *See* Fed. R. Civ. P. 1.  The parties fully briefed the motion. ECF Nos. 55, 60, 64.  A hearing is unnecessary.  *See* Loc. R. 105.6.

evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id*.

On a motion for summary judgment, I consider the facts in the light most favorable to Plaintiffs as the non-moving party, drawing all justifiable inferences in their favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Titan Indem. Co. v. Gaitan Enters., Inc.*, No. PWG-15-2480, 2016 WL 6680112, at *1 (D. Md. Nov. 14, 2016). Likewise, to determine the availability of qualified immunity, I take the facts alleged "in the light most favorable to the party asserting the injury," that is, Plaintiffs. *Meyers v. Baltimore Cnty.*, 981 F. Supp. 2d 422, 429 (D. Md. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other grounds in Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009)); *see Queen v. Prince George's Cnty.*, 188 F. Supp. 3d 535, 544 (D. Md. 2016) (same).

## Background[2]

Late on the evening of October 22, 2014, Michael Minor, who had been drinking, argued with his girlfriend, Beverly Lewis, in her house where he sometimes stayed and where her teenage son TR[3] was present. Lewis Dep. 19:11–18, 22:9–23:21, Defs.' Mem. Ex. A, ECF No. 55-1; Wade Dep. 77:18–21, Defs.' Mem. Ex. B, ECF No. 55-1. He went "to the attic to get his

---

[2] Defendants contend that Plaintiffs' "factual record should be disregarded" because they failed to collaborate with Defendants to file a joint statement of undisputed facts, as directed in the Case Management Order, ECF No. 2. Defs.' Reply 2. Although cooperative work is essential to fair and efficient litigation, it is reasonable to submit separate statements of facts when a significant number of facts that one or both parties believe to be material are in dispute. Moreover, I note that the parties also failed to file a joint record, as required by Paragraph C.2 of the Case Management Order. Therefore, I will accept Plaintiffs' Statement of Relevant Facts.

[3] It is unclear whether TR is a minor. In an abundance of caution, the Clerk shall seal ECF Nos. 55-1, 60, 60-1, and 60-2 temporarily. By February 28, 2017, the parties shall notify the Court whether TR is a minor and, if he is, provide copies of all of these filings with TR's name redacted.

gun," and Lewis and her son called 911. Lewis Dep. 24:18–25:21. Lewis told the 911 operator that Minor "said he was going to go to the attic to get his gun." *Id.* at 25:17–20. She testified that she "never saw a gun," that night or previously. *Id.* at 32:15–33:5. Her son corroborated her testimony that they informed the 911 operator that he "might" have a gun because Minor "claim[ed] he always had a concealed weapon in the house," but they had "never seen it." TR Dep. 19:18–20, Pls.' Opp'n Ex. 2, ECF No. 60-2.

Minor left the premises with his dog, and Deputy Sheriffs Wade and Tiffany Pullam-Jones arrived. Lewis Dep. 26:14–19, 35:10–38:10. According to Wade, Lewis informed him when he arrived that "Michael Minor destroyed her house" and, "as [had been] communicated to [him] through dispatcher and [his] supervisor," that "Minor had a gun, and that he left." Wade Dep. 40:16–20. Lewis testified that she told him that Minor "came home drunk and he was drunk and he want[ed] to be violent and fight [her]." Lewis Dep. 39:14–17.

The parties agree that the dog returned before Minor, at which point it was early morning on October 23, 2014. Lewis Dep. 45:15–46:4; Wade Dep. 46:4–5, 47:8–9; Pullam-Jones Dep. 36:19–37:2, Pls.' Opp'n Ex. 3, ECF No. 60-3. Deputy Sheriffs Wade and Pullam-Jones were inside the house, where the storm door was shut and locked but the front door was open. Wade Dep. 46:3–4. The upper portion of the door held a screen. *Id.* at 76:17–77:2. Lewis testified that she put the dog in its cage. Lewis Dep. 45:15–46:4. Pullam-Jones testified that the dog "walked by the door," after which she "didn't see the dog anymore," and she and Wade "discussed [that] the suspect may be around" and both "unholster[ed] [their] weapons" as Minor "walked to the door." Pullam-Jones Dep. 36:19–37:19. Wade testified that first, "a pit bull [came] running up to the door, barking, and growling, and scratching." Wade Dep. 46:4–5. He

said that when Minor then appeared, he was "very aggressive verbally" and refused "to get his dog." *Id.* at 56:18–20.

Wade testified that Minor was wearing "a loose-fitting shirt" that covered his waistband and prevented Wade from "mak[ing] out any specifics of his frame or anything on his person." Wade Dep. 60:3–5, 68:20, 69:4–14. But, according to Lewis, Minor was wearing a zipped-up gray hoodie over his white t-shirt. Lewis Dep. 26:17, 30:19–21, 34:16–18. Plaintiffs assert that Minor was holding a bottle in his right hand. Pls.' Opp'n 2. Yet, the only evidence they produce of the bottle is the deposition testimony of their expert on "reasonable police practices," Timothy Longo, Sr., who said that, if Minor had a bottle in his right hand, as Wade testified (although according to Longo, Wade later stated that "he doesn't even recall that to be the case"), "[i]t would certainly call into question Minor's ability to be able to grasp something if he had something already in his hand." Longo Dep. 81:11–13, 107:5–25, Pls.' Opp'n Ex. 5, ECF No. 60-5.[4] And, Lewis testified that the bottle of alcohol Minor had been drinking was sitting on the table in the house. Lewis Dep. 39:17–21.

According to Deputy Sheriff Wade, "[a]fter Mr. Minor appeared at the door, [Wade] had [his] weapon down, out of [his] holster, in [his] hand, by [his] leg, at what [officers] call low ready." Wade Dep. 71:12–14. Wade testified that he positioned himself between Minor and Lewis, her son, and Pullam-Jones and he yelled twice for Minor to "[g]et on the ground," but Minor "said 'No'" and "tr[ied] to open the door, the storm door." *Id.* at 47:11–19, 57:3–8. Wade and Pullam-Jones yelled at Minor for him to show them his hands, but he refused. *Id.* at 57:11–

---

[4] The parties disregarded the Court order to include the complete transcripts for the deposition testimony they cite and to highlight the relevant portions, despite the requirement of Paragraph C.2 of the Case Management Order that "[a]ll deposition transcripts shall be provided in their entirety" and "the cited portions shall be highlighted in a manner that allows both the highlighting and the highlighted text to be clear and easily seen as filed."

15.  Wade directed Minor three times "to not reach for his waist," and Minor "tapped his waist"

after the first command, "disobeyed" the second command, and then after the third command,

"he went into his pants, went under his shirt, went into his waistband." *Id.* at 58:5–59:11.  Wade

did not remember which hand Minor used to reach into his waistband.  *Id.* at 60:16–18.  He

recalled:

> So when we were-- when I gave, I believe, my last command, which was
> one of several, I specifically told Mr. Minor, again, "Do not reach for your
> waistband." And not only-- and if he were to do that, that he would be shot, not
> only did Mr. Minor acknowledge my command, as he did the previous ones, with
> all of the totality of the information that I received from everyone involved: the
> dispatcher, again, the victim, Ms. Lewis, her son, saying that Mr. Minor was
> armed, and not only was he armed but he was back at the front door; he was being
> aggressive; he had this aggressive pit bull with him; he was disobeying every
> command that I gave him, every command that was shouted to him by my partner;
> and not only did he disobey them but he did the exact opposite of what I instructed
> him to do, at this point he reached in his band, waistband.
>
> I believed, because of my training, . . . that people draw from their
> waistband area, I believed that he was drawing a weapon to kill me, to kill Ms.
> Lewis, who he's been threatening, her son, who he's been threatening, who[se]
> house he just . . . finished terrorizing, in accordance with the protocol and my
> training, that's when he went down to his waistband, he dug under his shirt,
> went down to his waistband, and as he began to what I believe to . . . draw a
> weapon, I fired three shots.

*Id.* at 74:4–75:12.

As Lewis recalled, when Minor "reached the door," Deputy Sheriff Wade told him to

"raise [his] hands above [his] head."  Lewis Dep. 48:10–15.  Lewis, who was inside and could

not see much of Minor because "th[e] door covered a lot," said that "Michael must have dropped

his hand, because [she] didn't see it anymore."  *Id.* at 48:16–49:3.  She testified that she "could

see his left side . . . his leg" and "a little bit of the upper [shoulder/chest area on his left]."  *Id.* at

48:17–49:4.  She could not see the right side of Minor's body.  *Id.* at 50:5–7.  She testified that

"Michael did something, and the male officer drew his weapon" and instructed him again to raise

6

his hands, after which Minor asked why he could not return home, and Wade again directed him to raise his hands and said, "If you do that one more time, I will shoot you." *Id.* at 50:11–51:13. Minor responded, "Shoot me?," and Deputy Sheriff Pullam-Jones directed him to raise his hands. *Id.* at 51:17–52:5.   Minor then "was moving his arm" and "reached towards the front of his jacket." *Id.* at 156:9–14.[5]  Lewis "took [her] eyes off of Michael and [she] put [her] eyes on the deputy," and then she heard "the gun go off and the flash from the shell drop." *Id.* at 52:18–21.

TR recalled that Wade told Minor "to raise his hands and don't move," but "Minor [was] drunk, and he didn't listen."  TR Dep. 33:12–14.  Wade "kept telling him three times before he pulled his concealed weapon out." *Id.* at 33:14–16.  TR testified that Minor then "proceeded to go in his pocket," but he also testified that he "couldn't see anything" from where he was in the house. *Id.* at 34:3–17.

After Wade shot Minor, the deputy sheriffs went outside and Pullam-Jones immediately began to administer aid.  Wade Dep. 127:11–13.[6]  "Paramedics were called to the scene to attend to Michael Minor.  He was then transported to a local hospital where he was later pronounced dead." Defs.' Mem. 4–5.

Longo opined:

> If the testimony of Deputy Wade as it is represented in his deposition testimony and in his initial interview with the Internal Affairs Division of the Prince George's County Police Department, if that testimony is deemed to be credible, I think his actions were consistent with generally accepted policing practices.
> On the other hand, if Michael Minor was shot for simply not getting on the ground and not raising his hands, absent more, those actions were contrary to generally accepted policing practices.

---

[5] Page 156 of Lewis's Deposition appears in Plaintiffs' Opp'n Ex. 1, ECF No. 60-1.  Lewis referred to Minor's hoodie as a "jacket."

[6] Page 127 of Wade's Deposition appears in Plaintiffs' Opp'n Ex. 4, ECF No. 60-4.

Longo Dep. 81:14–24.

Plaintiffs' Amended Complaint includes claims for wrongful death (Count II) and violation of Article 24 of the Maryland Declaration of Rights (Count VI) against Deputy Sheriff Wade and, under the theory of *respondeat superior*, the County.  *See* Am. Compl. ¶¶ 21–23, 33–35; Pl.'s Opp'n 25–26 n.2 (stating that "Plaintiffs[] have not brought any common law claims against defendant Prince George's County directly").  Their additional claims against Deputy Sheriff Wade are for assault and battery (Count III), deprivation of civil rights and excessive force/police brutality, in violation of § 1983 (Counts IV and VII); and intentional infliction of emotional distress (Count V).

Defendants argue that Deputy Sheriff's Wade's actions were objectively reasonable, and therefore he is entitled to qualified immunity from Plaintiffs' § 1983 claim in Count IV[7] and Plaintiffs' state constitutional claim in Count VI should be dismissed.  Defs.' Mem. 11, 13.  They insist that, for the same reason, they are entitled to summary judgment on Plaintiffs' wrongful death and assault and battery claims.  *Id.* at 21, 22.

Defendants contend that "Wade cannot be found liable for intentional infliction of emotional distress" because there is no evidence that the decedent, who was killed immediately, suffered any emotional distress, and Plaintiffs, who were not present, cannot provide testimony to that effect.  *Id.* at 20–21.  Additionally, they argue that the conduct must be extreme and outrageous, but Wade's conduct was reasonable.  *Id.* at 20.  They contend that governmental immunity bars Plaintiffs' wrongful death claim against the County.  *Id.* at 18–20, 21.  They also

---

[7] Defendants do not address Plaintiffs' § 1983 claim in Count VII, but given that they argue generally that "Police officers acting with 'objective reasonableness' are entitled to qualified immunity from § 1983 claims," Defs.' Mem. 7, I construe their argument with regard to Count IV to pertain to Count VII also.

contend that Plaintiffs' wrongful death claim fails because Plaintiffs fail to state a separate claim for negligence.  *Id.* at 18.

## Discussion

### *Qualified Immunity*

Qualified immunity "protects law enforcement agents from federal claims when they act in objectively reasonable reliance on existing law." *Queen v. Prince George's Cnty.*, 188 F. Supp. 3d 535, 541 (D. Md. 2016) (quoting *Rockwell v. Mayor & City Council of Baltimore*, No. RDB-13-3049, 2014 WL 949859, at *8 n. 10 (D. Md. Mar. 11, 2014)).  It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

Pursuant to this doctrine, police officers are not liable under § 1983 unless "(1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was 'clearly established' such that a reasonable person would have known his acts or omissions violated that right." *Streater v. Wilson*, 565 Fed. App'x 208, 210 (4th Cir. 2014) (quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011) (internal citations omitted)). The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in th[is] particular case at hand." *Pearson*, 555 U.S. at 236.  The defendant carries the burden of proving

qualified immunity. *McDonnell v. Hewitt–Angleberger*, No. WMN-11-3284, 2013 WL 4852308, at *3 (D. Md. Sept. 9, 2013) (quoting *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013)).

Notably, "*Graham v. Connor*, [490 U.S. 386 (1989)], clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *receded from on other grounds by Pearson*, 555 U.S. 223. Therefore, when, as here, the plaintiffs "allege[] that a police officer has unconstitutionally used deadly force, the officer's actions are judged on a standard of objective reasonableness." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998) (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The Court

> consider[s] what a "reasonable officer on the scene" would have done, taking into account such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." This evaluation is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair. Thus,
>
>> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight....The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation.

*Id.* at 787 (quoting *Graham*, 490 U.S. at 396–97). Relevantly, the Fourth Circuit "has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001). Indeed, "a police officer need not, in all circumstances, 'actually detect the presence of an object in a suspect's hands before firing on him.'" *Sigman*, 161 F.3d at 788 (quoting *McLenagan v. Karnes,* 27 F.3d 1002, 1007 (4th Cir. 1994)). Additionally, "minor discrepancies in testimony do

not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point than that of the officers." *Anderson*, 247 F.3d at 131.

In the context of qualified immunity, the objective reasonableness inquiry "has a further dimension" than a simple excessive force analysis because

> [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier*, 533 U.S. at 205. As a result, "qualified immunity affords government officials greater protection than a simple defense on the merits," as "[a] police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991).

Here, although Deputy Sheriff Wade was the only one with a clear vantage point for viewing Minor's actions, Lewis and TR also were present when Wade shot Minor, and their testimony regarding Wade's interactions with Minor is not entirely consistent with Wade's. And, while it is undisputed that Wade knew Minor might have a gun, it is disputed whether Wade believed that Minor indeed had a gun. Yet, the Fourth Circuit consistently has held that the testimony of a law enforcement officer that is contradicted by bystanders but corroborated by other officers, or that is not contradicted with regard to the material facts, is sufficient to establish the objective reasonableness of the officer's use of deadly force, even when there are minor discrepancies in the testimony, including with regard to whether the person whom the officer shot had a weapon and how that person responded to the officer's commands. *See Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001); *Loney v. Miles*, 213 F.3d 631, 2000 WL

530319 (4th Cir. May 3, 2000) (Table); *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998).   These cases provide guidance in resolving the issue of qualified immunity in the case before me.

In *Sigman v. Town of Chapel Hill*, Donna Solomon asked neighbors to call 911 to seek police intervention in the domestic dispute she was having with her live-in boyfriend, Mark Sigman.   161 F.3d at 784.   When two police officers arrived, they found Solomon outside the house; she informed them that Sigman, who "had recently been laid off from his job and had drunk five or six beers," was "inside the house and out of control" and "had a knife."   *Id.*   The officers knocked on the door, and "Sigman told them to 'get the hell away from the door,'" screamed at them to leave, threatened to "cut [their] head[s]" and "kill [Solomon]," and "broke a glass window beside them."   *Id.*   At that point, "[t]he officers drew their guns" and called for back-up.   *Id.*

Four more officers arrived, and the commanding officer on the scene, Officer Riddle, "attempted to talk to and calm Sigman," who "called him a 'mother f—ker,' and said, 'I'm going to kill you,' . . . threw objects at [him] through the broken window and reached through the window with his knife" and "began swinging a knife at Riddle through the window."   *Id.* at 784–85 (omission in original).   When "Officer Riddle asked Sigman to come out, . . . Sigman replied with words similar to, 'If you want me, come in and get me. But you're going to get hurt.'"   *Id.* at 785.   All of the officers testified that Sigman came out of the house, holding a knife.   *Id.*   They "yelled for Sigman to drop the knife and stop approaching . . . several times," but "Sigman ignored them, making statements such as, 'Go ahead and shoot me' and 'I want to die."   *Id.*   A crowd "gathered along the street behind the officers some distance away and was cheering Sigman on."   *Id.*   He "continued to walk toward Officer Riddle, holding his knife in a threatening

manner." *Id.* When he was "10 to 15 feet away from Officer Riddle, Riddle shot Sigman twice in rapid succession, mortally wounding him." *Id.* The officers approached and found a knife on the ground near Sigman's hand. *Id.*

Sigman's parents filed suit against the officers and the town of Chapel Hill, North Carolina, pursuant to § 1983 and the North Carolina wrongful death statute, and the defendants moved for summary judgment, asserting, *inter alia*, that the officers were entitled to qualified immunity. *Id.* In opposition, the plaintiffs produced three affidavits from eyewitnesses "who were among the cheering crowd across the street" and who "stated that pursuant to the police officers' numerous commands, 'Sigman came out of the house with his hands raised'" and "'nothing in them.'" *Id.* at 786. The district court granted summary judgment, reasoning that the bystanders' affidavits "were not sufficient to create a material issue of fact" because "'at best[]' [they] created 'a difference of opinion as to what the three witnesses observed . . . and what Riddle observed.'" *Id.* It "held that nothing contradicted the fact that a reasonable officer would have perceived Sigman as a dangerous threat," and therefore "Riddle's actions were objectively reasonable." *Id.*

On appeal, the Fourth Circuit noted that it was "undisputed that, at the moment that Sigman stepped out of the house, Officer Riddle had ample knowledge of Sigman's dangerousness," in that Sigman had a knife, had been drinking, "slashed at him through the window" and "made threats on his life" and others' lives. *Id.* at 787. Additionally, "Sigman had not previously responded to his requests to calm down" and "when Sigman emerged from the house, he did not obey the officers' commands," instead taking "a number of steps towards Officer Riddle." Also, "the atmosphere was volatile and threatening." *Id.*

As for whether Sigman had a knife, the Fourth Circuit concluded that the fact was not material, reasoning that

> [i]t will nearly always be the case that witnesses ... differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact. What matters is whether the officers acted reasonably upon there [sic] ports *available to them* and whether *they* undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances *they faced.*

*Id.* at 787 (quoting *Gooden v. Howard County,* 954 F.2d 960, 965 (4th Cir.1992) (en banc) (emphasis added in *Sigman*)).  Further, the court concluded that the eyewitnesses' observations that contradicted Officer Riddle's recollections could not

> effectively impact the credibility of Officer Riddle's testimony (or that of all five other officers on the scene) as to his perceptions of what he saw from an entirely different—and closer—vantage point, especially when Officer Riddle had special knowledge of Sigman's dangerousness and of the threats that Sigman had made on his life.

*Id.* at 788.  And, even if the affidavits could call into question whether Sigman had a knife when he exited the house, the court concluded that

> [w]here an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently—and potentially still is—armed, and who is coming towards the officer despite officers' commands to halt, . . . the officer's decision to fire is not unreasonable.

*Id.*  Thus, the Fourth Circuit "reject[ed] the argument that a factual dispute about whether Sigman still had his knife at the moment of shooting [was] material to the question of whether Officer Riddle is entitled to the protections of qualified immunity in the particular circumstances of this case," concluding that he was.  *Id.*  The court also held that, because the officer's "actions were, as a matter of law, reasonable in the circumstances of th[at] case, they cannot be negligent or wrongful, as required by [the North Carolina wrongful death statute]."  *Id.* at 789.

14

In *Anderson v. Russell*, two police officers approached Anderson outside a mall because they perceived "a bulge under Anderson's clothing on his left side near his waist band that [Officer] Russell believed to be consistent with a handgun"; it turned out to be "a shoe polish container inside an eyes-glasses case." 247 F.3d at 128. Before they knew what the bulge was, they ordered him to raise his hands and get on his knees. *Id.* Anderson raised his hands and then lowered them "in an attempt to reach into his back left pocket to turn off his Walkman radio." *Id.* Russell mistook the movement to be Anderson "reaching for the . . . weapon," and shot him three times. *Id.*

Anderson filed a § 1983 action for excessive for against Office Russell. *Id.* at 127. The jury found that Russell used excessive force and was not entitled to qualified immunity, and the trial court granted Russell's motion for judgment as a matter of law regarding qualified immunity only, holding that "because Russell's use of force complied with his training, he was entitled to qualified immunity as a matter of law." *Id.* at 128–29. On appeal, the Fourth Circuit concluded that "Russell's use of force did not violate the Fourth Amendment and, therefore, that the § 1983 excessive force claim should not have been submitted to the jury." *Id.* at 129. It did not address qualified immunity, *see id.*, but its analysis of the objective reasonableness of the officer's use of force is informative nonetheless.

Observing that "the evidence conclusively establishe[d] that Russell reasonably perceived Anderson to be armed with a gun," the appellate court stated that Anderson "was justified in believing that Anderson was armed and dangerous." *Id.* at 130. Additionally, it noted that both officers "testified, and Anderson concede[d], that immediately before Russell fired, Anderson was lowering his hands in the direction of the bulge in disregard of the officers' order." *Id.* The Fourth Circuit concluded that "[g]iven the uncontroverted evidence as to what Russell perceived

immediately before firing, . . . there [was not] a legally sufficient evidentiary basis for a rational jury to find for Anderson on the issue of excessive force." *Id.*

The Fourth Circuit rejected Anderson's argument that, based on eyewitness testimony from an man who was standing ten to twenty feet farther away than the officers, inside the mall, with his "view of Anderson's hands . . . obstructed by a partition on the door frame through which he was viewing the incident," there was "a triable issue of fact . . . regarding the precise positioning of Anderson's hands and the speed at which he was lowering his hands at the time he was shot." *Id.* The court noted that "[i]n a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer," and therefore "minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point than that of the officers." *Id.* at 130–31.

*Loney v. Miles*, 213 F.3d 631, (4th Cir. May 3, 2000) (Table), also is on point. There, Officer Jeffrey Miles fatally shot Marco Antoine Loney after pursuing him on foot after he fled from a car that another officer had pulled over. 2000 WL 530319, at *1. The officer testified that, during the chase, Loney slipped and he "saw an object fall to the ground which appeared . . . to be an ammunition clip from a handgun," causing Miles to believe Loney had a gun. When Miles "yelled, 'Police, Stop[,]' Miles saw [Loney] bring both his left and right arms in close to his body and appear to reach into the waistband of his pants," after which he continued running and then "appeared to reach once again into the waistband of his pants with his right hand." *Id.* Miles fired his gun when Loney "brought his right arm up and out and turned his head and upper

body to the right," at which point "Miles 'believed he had a weapon and was preparing to shoot.'" *Id.*

The administratrix of Loney's estate brought a § 1983 claim against Miles, and Miles moved for summary judgment on qualified immunity grounds. *Id.* In opposition, the administratrix presented four affidavits from witnesses, one of whom "did not actually see Loney being shot," two of whom "could not be located for depositions," and the last of whom, Watson, "signed two affidavits that contradicted each other" and then "gave deposition testimony that contradicted his affidavits." *Id.* The three witnesses to the shooting agreed that that when "Loney . . . saw the officer[,] Loney immediately raised his shoulders and put his arms over his head." *Id.* at *1–2. Yet, Watson later "admitted that he was looking at Officer Miles when the gun went off and that he did not observe Loney's actions before the gunshot. *Id.* at *2. The administratrix also provided the biopsy report, which indicated the path and direction of the bullet in Loney's body. *Id.*

The Fourth Circuit affirmed the district court's summary judgment ruling in the officer's favor, reasoning that none of the affidavits "satisf[ied] Loney's burden of showing a material dispute warranting trial." *Id.* at *3. The court observed that one of the affiants "did not see Loney being shot" and two others could not be found, such that their affidavits did not "set forth such facts as would be admissible in evidence," as Rule 56(e) required at the time, and therefore could not be considered on summary judgment.[8] *Id.* The fourth witness's affidavits did "not create an issue of material fact" because his later deposition testimony thoroughly contradicted

---

[8] While Rule 56(e) previously "require[d] that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge," *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996), now, on a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2).

them and showed that he "was looking at Officer Miles when the gun went off and . . . did not observe Loney's actions before the officer fired his gun."   *Id.*   Nor was the autopsy report "inconsistent with Miles's account."   *Id.*

The outcomes of these three cases control the outcome of the case before me.   Here, it is undisputed that, as in *Sigman*, the police were called to the scene because someone (in this case Minor) had made violent threats and might have a weapon on him.   Like the officer in *Sigman*, Wade "had ample knowledge of [Minor's] dangerousness," as Wade knew that Minor had been drinking (like Sigman), had threatened Lewis (as Sigman had threatened Solomon), had said that he was getting his gun, and refused to obey Wade's commands.   *See Sigman*, 161 F.3d at 787. Whether he actually had a gun on him is immaterial, as it was reasonable for Deputy Sheriff Wade to believe he was armed based on Lewis's and TR's assertions that Minor told them he kept a gun in the attic and had gone to retrieve it.   *See id.*

Here, as in *Sigman* and *Anderson*, the officer used deadly force in response to someone (Minor) refusing to obey his commands and behaving in a way that the officer found threatening. Sigman was approaching the officer outside; Wade tried to open the storm door between him and the officer, and only the screen of that door separated the two.   Anderson, Loney, and Minor each were shot when they moved their hands toward what the officer wrongly perceived to be a gun.   *See Anderson*, 247 F.3d at 128; *Loney*, 2000 WL 530319, at *1.

In *Sigman* and *Anderson*, the officer's testimony was corroborated by other officers but contradicted by bystanders with an inferior vantage point.   In *Loney*, as in this case, the officer's testimony was not corroborated but also was not contradicted.   Here, while the witnesses may differ in their recollections of the dog's behavior, Minor's attire, Deputy Sheriff Wade's exact commands, and when Wade drew his gun, there is no contradictory testimony with regard to any

material facts.   Insofar as Lewis's and TR's testimony created any disputes, it does not "effectively impact the credibility of [Deputy Sheriff Wade's] testimony . . . as to his perceptions of what he saw from an entirely different—and closer—vantage point," *see Sigman*, 161 F.3d at 788, and "minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point than that of the officers," *Anderson*, 247 F.3d at 131.   Wade's testimony is, in fact, corroborated by Lewis and TR as to the material facts.   Although neither could clearly see Minor, Lewis could tell that, despite Wade's orders, he did not have his arms raised, because she could not see his hands, and TR heard Wade repeatedly direct Minor to raise his hands and not to move.   And, although Lewis could not tell what Minor was doing with his arms and hands and thought that he "reached towards the front of his jacket," she, like Wade, testified that Minor moved his arms.

In *Sigman* and *Anderson*, the facts were more favorable to the plaintiffs than the facts are for Plaintiffs here, as those plaintiffs produced evidence in support of their positions, yet they did not prevail in their oppositions to the defendants' summary judgment motions.   Indeed, Plaintiffs have not presented any evidence that Minor was not intoxicated and belligerent, or that he obeyed Deputy Sheriff Wade's commands or kept his arms raised, without moving them in a way that could cause a reasonable officer to believe he was reaching for a gun.   Thus, there is "nothing [to] contradict[] the fact that a reasonable officer would have perceived [Minor] as a dangerous threat."  *See Sigman*, 161 F.3d at 786.

Thus, taken in the light most favorable to Plaintiffs, the material evidence shows that Wade reasonably believed that Minor recently acted aggressively enough to prompt Lewis and her son to call 911 seeking protection; had made violent threats; had announced that he was getting a gun; and reached to open the storm door and enter the house where the officers, Lewis,

and her son were.  It also shows that only a screen separated Minor from the occupants of the house and, as someone who sometimes stayed at the house, Minor might have had a key. Moreover, Minor repeatedly refused to follow the officer's commands, and Minor moved his arm or hand to where he could have had a gun concealed.  Thus, Minor "posed an immediate threat to the safety of the officers or others," and if he was not "actively resisting arrest," he was at least actively resisting submitting to the officer's control.  *See Sigman*, 161 F.3d at 787 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).  Here, as in *Anderson*, "the severity of the crime at issue" is "irrelevant . . . because [the Court's] focus is on the circumstances as they existed at the moment force was used," and "[a]t the precise moment that [Wade] used deadly force, he reasonably believed that [Minor] posed a deadly threat to himself and others." *See Anderson*, 247 F.3d at 131–32.  And, Deputy Sheriff Wade did not need to wait for Minor to point the gun at him or even see the gun in Minor's hands "before [he was] entitled to take action."  *Id.* at 131; *Sigman*, 161 F.3d at 788; *McLenagan*, 27 F.3d at 1007.  "[A] reasonable officer possessing the same information *could* have believed that [use of deadly force] was lawful."  *See Slattery*, 939 F.2d at 216.

Wade has met his burden of proving qualified immunity, *see id.*, and Plaintiffs have not identified any facts supporting their position that Wade's actions were unjustified.  Therefore, summary judgment in Wade's favor is proper on the § 1983 claims (Counts IV and VII). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986); Fed. R. Civ. P. 56(a), (c)(1)(A).

*Objectively Reasonable Use of Force*

1. *State constitutional claim*

Plaintiffs claim that "[t]he acts of Defendant Wade in repeatedly shooting, and shooting at Michael Minor for no legitimate reason and while he was unarmed and presenting no threat of any kind to anyone were in violation of Article 24 of the Maryland Declaration of Rights."  Am. Compl. ¶ 34.   They argue that, under Maryland law, "governmental entities do not enjoy immunities for violations of the Maryland Constitution," and "Defendant Wade is not entitled to public immunity."  Pls.' Opp'n 23–24.  In Reply, Defendants state that they do not argue that the County is entitled to governmental immunity from this claim; "[r]ather, Defendants contend that Prince George's County, Maryland is entitled to summary judgment on the Article 24 claim because Wade's actions were 'objectively reasonable.'"   Defs.' Reply 11.   And, while Defendants still assert "[t]he doctrine of public official immunity" in their Reply, they raise it as a "bar[] [to] Plaintiff's *common law* claims against Deputy Sheriff Wade," not the state constitutional claim against him.  *See id.* (emphasis added).  Therefore, I will consider whether the undisputed facts establish Defendants' liability under Article 24.

Article 24 of the Maryland Declaration of Rights "prohibit[s] employment of excessive force during a seizure," and the same standard of objective reasonableness applies for analyzing an Article 24 claim as for analyzing a claim under the Fourth Amendment. *Henry v. Purnell*, 652 F.3d 524, 531, 536 (4th Cir. 2011) (citing *Randall v. Peaco*, 927 A.2d 83, 89 (Md. Ct. Spec. App. 2007)); *see also Beall v. Holloway-Johnson*, 130 A.3d 406, 417–18 (Md. 2016) ("The analysis for an Article 24 violation follows the analysis used for claims under the Fourteenth Amendment to the United States Constitution and, as a result, 'all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, . . . should be

analyzed under the Fourth Amendment['s] "reasonableness" standard.'" (quoting *Okwa v. Harper*, 757 A.2d 118, 141 (Md. 2000) (quoting *Graham v. Connor,* 490 U.S. 386, 395 (1989)))); *Espina v. Prince George's Cnty.*, 82 A.3d 1240, 1266 (Md. Ct. Spec. App. 2013) ("[A]n Article 24 claim is viable if a claimant can prove excessive force under the *Graham* test."), *aff'd sub nom. Espina v. Jackson*, 112 A.3d 442 (2015); *Smith v. Bortner*, 998 A.2d 369, 375 (Md. Ct. Spec. App. 2010) ("Maryland cases have said that the standard for analyzing claims of excessive force by police officers are the same under Articles 24 and 26 of the Maryland Declaration of Rights and that the test is one of objective reasonableness, as set forth in the U.S. Supreme Court's Fourth Amendment case of *Graham v. Connor*, 490 U.S. 386, 397 (1989)." (citing, e.g., *Okwa*, 757 A.2d at 141)). As noted, "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001) (citing *Graham v. Connor*, 490 U.S. 386 (1989)), *receded from on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Thus, Deputy Sheriff Wade's "actions are judged on a standard of objective reasonableness." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998) (citing *Graham*, 490 U.S. at 396–97).

I discussed this standard in detail in the section on qualified immunity, above. In the context of Article 24 liability, however, Deputy Sheriff Wade no longer has the "greater protection" that qualified immunity provided from the federal claims. *See Saucier*, 533 U.S. at 205. The inquiry differs in that qualified immunity is available even if the officer was mistaken in believing that it was legal to employ deadly force. *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991). The question now is not whether "a reasonable officer possessing the same information *could* have believed that his conduct was lawful," *id.*, but rather whether Wade's conduct was, indeed, lawful.

Here, there was no "mistaken understanding" by Deputy Sheriff Wade regarding whether the use of deadly force was legal in the circumstances under which he shot Minor.  *See Saucier*, 533 U.S. at 205.  Rather, it is well established that "[a] police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others."  *Littleton v. Swonger*, 502 F. App'x 271, 275 (4th Cir. 2012) (quoting *Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir.1996) (citing *Tennessee v. Garner,* 471 U.S. 1, (1985))).  As I concluded above, the undisputed, material facts establish that Deputy Sheriff Wade was told that Minor was threatening violence and had said he was retrieving his gun, and Wade observed Minor's drunken state, attempt to enter the house, and unwillingness to follow Wade's commands.  Additionally, Wade saw Minor move his hand to where he could have had a gun.  On that basis, Wade had "sound reason to believe" that Minor "pose[d] a threat of serious physical harm to the officer or others."  *See id.*  Therefore, Deputy Sheriff's Wade's actions were objectively reasonable under the Fourth Amendment and Article 24 of the Maryland Declaration of Rights, and Plaintiffs cannot prevail on their state constitutional claim (Count VI).

### 2. *Assault and battery and intentional infliction of emotional distress*

Plaintiffs also claim that Deputy Sheriff Wade is liable for assault and battery because he "without proper grounds, willfully and maliciously shot Michael Minor, the decedent, at least 2 times, . . . without justification and without decedent presenting any threat of any kind to Defendant Wade or anyone else."  Am. Compl. ¶ 25.  And, they claim intentional infliction of emotional distress, based on Wade's allegedly "extremely reckless, malicious and indifferent conduct, including but not limited to murdering him."  *Id.* ¶ 31.  But when, as here, "the use of force was objectively reasonable, any state law claim for assault or battery would also fail." *Holloman v. Rawlings-Blake*, No. CCB-14-1516, 2015 WL 4496413, at *5 n.11 (D. Md. July 22,

2015), *aff'd sub nom. Holloman v. Markowski*, No. 15-1878, 2016 WL 5864510 (4th Cir. Oct. 7, 2016).   Likewise, given that an element of an intentional infliction of emotional distress claim is that "the conduct alleged must be 'extreme and outrageous,'" and I have concluded that Deputy Sheriff Wade's actions were objectively reasonable, he is entitled to summary judgment on this claim as well.  *See Jackson v. Pena*, 28 F. Supp. 3d 423, 432 (D. Md. 2014) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).

### 3.   Wrongful death

Additionally, Plaintiffs claim that "[a]s a direct result of the negligence and/or wrongful acts of the defendants, Plaintiffs and the next of kin of the decedent, incurred burial expenses, loss of the pecuniary value of services excepted to be performed by the decedent and other damages recoverable under the [Wrongful Death] Act."   Am. Compl. ¶ 23.   The Maryland Wrongful Death Act provides that "[a]n action may be maintained against a person whose wrongful act causes the death of another."   Md. Code Ann., Cts. & Jud. Proc. § 3-902(a).   "A wrongful act is 'an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued.'"   *Estate of Morris v. Goodwin*, No. DKC-13-3383, 2015 WL 132617, at *7 (D. Md. Jan. 8, 2015) (quoting *Grinage v. Mylan Pharm., Inc.,* 840 F. Supp. 2d 862, 872–73 (D. Md. 2011) (quoting Cts. & Jud. Proc. § 3–901(e))).   Stated differently,

> To succeed on a wrongful death claim under Maryland law, a plaintiff who qualifies as a beneficiary under the wrongful death statute "must show by a preponderance of the evidence that the conduct of [the] defendant was negligent and that such negligence was a proximate cause of the death of the decedent."   *Weimer [v. Hetrick,* 309 Md. 536, 554, 525 A.2d 643, 652 (1987)].

*Young v. Swiney*, 23 F. Supp. 3d 596, 613 (D. Md. 2014) (quoting *Osunde v. Lewis,* 281 F.R.D. 250, 260 (D. Md. 2012) (citations omitted).   Because, as discussed above, Deputy Sheriff

Wade's "actions were, as a matter of law, reasonable in the circumstances of this case, they cannot be negligent or wrongful, as required by [the Wrongful Death Act]." *See Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998) (discussing North Carolina wrongful death statute, which similarly requires a negligent or wrongful act).

## ORDER

For the reasons stated in this Memorandum Opinion, it is, this 15th day of February, 2017, hereby ORDERED that

1. Plaintiffs' "Survival Act" claim (Count I) and their § 1983 claim against the County (Count VIII) ARE DISMISSED with Plaintiffs' consent;

2. Defendants' Motion for Summary Judgment, ECF No. 55, IS GRANTED as to the remaining claims;

3. The Clerk SHALL SEAL ECF Nos. 55-1, 60,60-1, and 60-2;

4. The parties jointly SHALL NOTIFY the Court by February 28, 2017 whether TR is a minor and, if he is, provide copies of ECF Nos. 55-1, 60,60-1, and 60-2 with TR's names redacted; and

5. The Clerk IS DIRECTED to close this case.

            _____/S/_____
            Paul W. Grimm
            United States District Judge

lyb